# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GREGORY RAY GROCE, et al.,  )
                            )
            Plaintiffs,     )
                            )
       v.                   )          1:20cv1152
                            )
J.P. JACKSON, et al.        )
                            )
            Defendants.     )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Defendants' Motion for Summary Judgment" (Docket Entry 19 (the "Motion")).  For the reasons that follow, the Court will grant the Motion in part, as it relates to the federal civil-rights claim, and deny the Motion in part, remanding the state-law claims to Stokes County Superior Court.[1]

## BACKGROUND

### I. Procedural History

This case originated when Gregory Ray Groce ("Greg") and his wife, Danita Smith Groce ("Danita" and, together with Greg, "Plaintiffs") filed a lawsuit in Stokes County Superior Court against J.P. Jackson ("Jackson") and the City of King (the "City"

---

[1]  The parties consented, pursuant to "28 U.S.C. § 636(c), to the exercise by a United States Magistrate Judge of jurisdiction in this case" (Docket Entry 10 at 1 (bracket omitted) (referring case to undersigned "to conduct all proceedings including a jury or nonjury trial, to order the entry of judgment, and to conduct all post-judgment proceedings therein")).  (See also id. at 2, 3.)

and, together with Jackson, "Defendants"), asserting state-law claims for malicious prosecution and negligent infliction of emotional distress ("NIED"), as well as a claim for damages under the North Carolina Constitution and a federal civil-rights claim pursuant to 42 U.S.C. § 1983 ("Section 1983"). (<u>See</u> Docket Entry 1-1.) Defendants removed the action pursuant to 28 U.S.C. § 1441(a), invoking this Court's jurisdiction under 28 U.S.C. § 1331. (<u>See</u> Docket Entry 1 at 1.)[2] Upon removal, the Clerk docketed the complaint previously filed in Stokes County. (<u>See</u> Docket Entry 2 (the "Complaint").)

Defendants answered the Complaint, asserting various defenses (including sovereign immunity, public official immunity, and qualified immunity) and denying liability for Plaintiffs' injuries. (<u>See</u> Docket Entry 5.) Thereafter, the parties engaged in discovery (<u>see</u> Text Order dated Jan. 21, 2021 (adopting joint Rule 26(f) Report); Docket Entry 16 (order extending certain deadlines)), after which Defendants moved for summary judgment on all claims (<u>see</u> Docket Entry 19; <u>see also</u> Docket Entries 19-1 through 19-7

---

[2] In relevant part, that provision allows for removal of "any civil action brought in a State court of which the [federal] courts . . . have original jurisdiction . . . to the [federal] court . . . for the district and division embracing the place where such action is pending." 28 U.S.C. 1441(a). As stated in the notice of removal (<u>see</u> Docket Entry 1 at 1 (citing 28 U.S.C. § 1331)), this Court possesses original jurisdiction over the federal civil-rights claim, <u>see</u> 28 U.S.C. § 1331 ("[Federal] courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

-2-

(exhibits), 20 (supporting memorandum)).  Plaintiffs opposed the Motion.  (See Docket Entry 22.)  Defendants replied.  (See Docket Entry 23.)

## II. Allegations

According to the Complaint:

Sometime around "December 2018, [Plaintiffs] agreed to sell their inoperable 2001 Honda Accord vehicle ([bearing] license plate XRS 6982) [(the 'Vehicle')]" to Anthony Cecil [('Anthony')]" (Docket Entry 2 at 2).  With Plaintiffs' permission, Anthony towed the Vehicle to his property, where he repaired the Vehicle, rendering it operable.  (See id. at 2–3.)  On December 22, 2018, before Plaintiffs transferred the title to the Vehicle to Anthony, Anthony's brother, James Cecil ("James") operated the Vehicle without Plaintiffs' permission or Anthony's knowledge.  (See id.) James used the Vehicle to travel to a Sheetz gas station, in King, North Carolina, where he entered the convenience store, concealed certain merchandise in his clothing, and left the store without paying for the concealed items (the "Incident").  (See id. at 3.) The store manager quickly contacted an officer with the King Police Department (the "Department") to report the theft of the items (an assortment of candy valued at $13.88).  (See id.)

Jackson, an officer with the Department, investigated the Incident at Sheetz, where he observed store surveillance footage that depicted "[James] walking around the Sheetz store, concealing merchandise in his clothing[,] and paying for certain items before

-3-

exiting the store." (Id.) At the time of the Incident, James wore a baseball hat that obstructed the view of the top of his head and face. (See id. at 3-4.) Jackson recorded his review of the surveillance video on his body-worn camera, which captured Jackson verbalizing his discontent with the quality of the images. (See id. at 4.) During that review, "Jackson asked the store manager to stop the [] surveillance video so he could at least take a still shot photograph of [James] with his cellular telephone." (Id.) The photograph depicted only the lower half of James's face and the clothing James wore at the time. (See id.)

After the store manager provided Jackson with the license plate of the Vehicle (which James drove away from the scene), Jackson "determine[d] that the [V]ehicle . . . was owned by [Plaintiffs]." (Id.) "Jackson then accessed [Greg]'s North Carolina driver's license photograph . . . [and] compared [it] with the photograph he had taken of [James]" (id.) from the surveillance video. Based on that comparison, Jackson (mis)identified Greg as the perpetrator. (See id. at 4-5.)

Two days later, without further investigation (see id. at 5), Jackson "requested from a Magistrate, via video conference, the issuance of an arrest warrant for [Greg,] charging him with the crimes of larceny, possession of stolen goods, and concealment of merchandise" (id.; see also id. at 6 (faulting Jackson for requesting arrest warrant instead of criminal summons)). At the time of that conference, Jackson did not possess the surveillance

-4-

video from Sheetz. (See id. at 9.) In identifying Greg as the suspect, Jackson disregarded "clear physical differences between the individual depicted in the Sheetz surveillance footage and [Greg]'s driver's license photograph" (id. at 6-7). Jackson also failed to inform the Magistrate about the limitations of the surveillance video, including his inability to "clearly see the perpetrator's face" (id. at 7), and the fact that he had taken no other investigative steps (like determining whether Greg possessed a criminal history, inquiring into the payment method used by the perpetrator, or attempting to make contact with Greg) (see id. at 6-8). Shortly thereafter, based on "Jackson's false statement(s) and omissions" (id. at 8), the Magistrate issued a warrant (the "Warrant") for Greg's arrest (see id.).

That same day, Anthony notified Danita about the unauthorized use of the Vehicle by James, explaining that James had wrecked the Vehicle in connection with an incident during which he received charges for driving while impaired and driving while license revoked. (See id. at 8-9.) On December 31, 2018, Danita reported that unauthorized use to the Stokes County Sheriff's Office, prompting the Stokes County District Attorney's Office to bring criminal charges against James "for the unauthorized use of a motor conveyance" (id. at 9).

On February 21, 2019, Deputy A.C. Sawyers ("Sawyers") of the Stokes County Sheriff's Office traveled to Plaintiffs' residence to serve Greg with the Warrant. (See id.) Sawyers encountered Danita

-5-

instead, who reported Greg's location at work and the unauthorized use of the Vehicle by James.  (See id.)  Danita called Greg to advise him about the visit by Sawyers and the Warrant, during which conversation Sawyers told Greg to "come home immediately and submit to [] arrest" (id.).  "Sawyers instructed [Plaintiffs] to meet him outside the Stokes County Magistrate's office at the courthouse in Danbury, North Carolina."  (Id.)

Plaintiffs waited for Sawyers at the courthouse, where Sawyers eventually arrived with a detainee who "had ingested illegal drugs at the time of his arrest" (id. at 10), such that he experienced repeated vomiting episodes during his time at the courthouse (see id.).  After Greg appeared before a magistrate on the charges in the Warrant, Sawyers took him and the other detainee into custody at the jail.  (See id.)  Sawyers obtained fingerprints and photographs from Greg and then released him "with a directive not to go on Sheetz property or else he would be charged with felony trespassing."  (Id. at 10–11.)

Back at home, Greg called the Department to try "to learn more about the [ W]arrant . . . without success."  (Id. at 11.)  The following day, Danita likewise called the Department and spoke to an assistant, who listened to Danita's explanation about the physical differences between Greg and the perpetrator on the surveillance video and thereafter watched the video.  (See id.)  On February 25, 2019, Plaintiffs went to the Department to meet with Lieutenant Hale ("Hale"), "[d]uring [which] meeting[ Plaintiffs]

-6-

told [] Hale about the unauthorized use of the[ V]ehicle by James [] and their belief that he had stolen the candy from Sheetz." (Id. at 11-12.)   The following day, after Hale watched the surveillance video, he contacted Plaintiffs and informed them that he agreed the video depicted someone other than Greg.  (See id. at 12.)[3]  Hale explained that Jackson had failed to conduct a proper investigation, advised Plaintiffs about the dismissal of Greg's charges, and told them that "Jackson would [] prepar[e] a letter to facilitate the expungement of [those] charges."  (Id.)

Even after Hale acknowledged the misidentification, Plaintiffs continued to experience its consequences.  For example, a neighbor reported to Danita the frequent presence of a Stokes County Sheriff's Office patrol car in the neighborhood and advised that a deputy had spoken with her about an arrest warrant.  (See id.) Additionally, in March 2019, deputies with the Forsyth County Sheriff's Office executed a traffic stop on a vehicle driven by Greg, during which stop two deputies required Greg to exit his vehicle, given the existence of the (supposedly outstanding) Warrant.  (See id. at 13.)  After Greg attempted to clarify the situation, the deputies realized their mistake and apologized, but the experience nonetheless caused Greg to vomit when he returned home.  (See id.)  The Warrant also obligated Greg to discuss the

_____

[3] Within approximately two weeks, "Jackson appeared before a Stokes County Magistrate and obtained the issuance of a criminal summons against James [] for the alleged crimes committed on December 22, 2018."  (Id.)

situation with his supervisor at work and resulted in injury to his reputation. (See id.)

For her part, Danita sought medical treatment on several occasions, complaining of "malaise, fatigue, elevated blood pressure, myalgia, chest pain, insomnia, diarrhea and headache" (id.), as well as "anxiety and stress . . . as a result of [Greg]'s wrongful arrest and detainment" (id.). Her physician prescribed two medications, after which Danita experienced worsening symptoms, sought emergency treatment on two occasions, and ultimately received a diagnosis of serotonin syndrome. (Id. at 13-14.) Danita discontinued those medications, but the symptoms continued and intensified, leading her to seek month-long treatment at a facility in Florida. (Id. at 14.)

In connection with the foregoing allegations, the Complaint asserts the following claims:

(1) malicious prosecution against the City and Jackson in his individual and official capacities (see id. at 14-17 (the "Malicious-Prosecution Claim"));[4]

_____

[4] As against the City, Plaintiffs have alleged that "Jackson was acting within the course and scope of his employment as a police officer of the . . . Department with the knowledge, consent, and permission of the City" (id. at 16), such that "the acts and conduct of [] Jackson are imputed to the City . . . under the doctrine of respondeat superior and otherwise" (id. (italics omitted)).

(2) NIED against the City and Jackson in his individual and official capacities (see id. at 17-20 (the "NIED Claim"));[5]

(3) an "alternative . . . claim for damages pursuant to Article I, Sections 18, 19, and 25 of the North Carolina Constitution, against [the City and ] Jackson in [] his individual [] and [] official capacit[ies]" (id. at 20 (comma omitted and standard capitalization applied); see id. at 20-21 (the "State Constitutional Claim" and, together with the Malicious-Prosecution Claim and NIED Claim, the "State-Law Claims"));[6] and

(4) a "[Section] 1983 claim against [] Jackson in his individual capacity" (id. at 21 (standard capitalization applied)) for violation of Greg's fourth-amendment rights (see id. at 21-22 (the "Section 1983 Claim")).

Plaintiffs also have sought damages for loss of consortium in connection with the Malicious-Prosecution Claim and NIED Claim. (See id. at 17, 20 (asserting that Danita may recover for injuries to Greg and vice versa).)

### III. The Record

Together with the Motion, Defendants submitted (i) a declaration from Jackson (Docket Entry 19-1), (ii) a declaration

---

[5] As with the Malicious-Prosecution Claim, Plaintiffs have alleged that the City bears liability for Jackson's conduct on a theory of respondeat superior. (See id. at 19.)

[6] Plaintiffs pleaded the State Constitutional Claim "as an alternative remedy" (id. at 21), to the extent "governmental immunity in any of its various forms" (id.) bars Plaintiffs' recovery.

-9-

from Michael Christian ("Christian"), a sergeant for the Department (Docket Entry 19-2), (iii) copies of receipts from the Incident, documenting the transactions during which the perpetrator paid for certain items while he allegedly concealed other items (Docket Entry 19-3), (iv) two photographs from the surveillance video depicting the perpetrator (Docket Entries 19-4, 19-5 (the "Surveillance Photographs")), (v) a photograph of Greg as depicted on his driver's license (Docket Entry 19-6 (the "License Photograph")), and (vi) excerpts from the depositions of Plaintiffs (Docket Entry 19-7).

Plaintiffs attached to their response opposing the Motion (i) excerpts from the deposition of Jackson (Docket Entry 22-1 at 2–52), including as exhibits still images from the surveillance video (id. at 54, 63–98), a printout of the License Photograph and related information about Greg's driver's license (id. at 56), and a copy of the police report from the Incident (id. at 58–61 (the "Incident Report")), (ii) excerpts from their own depositions (Docket Entries 22-2, 22-3), (iii) a declaration from Hale (Docket Entry 22-4 at 2–4), including as exhibits letters from Jackson and Christian regarding the Incident and misidentification of Greg (id. at 5, 6), (iv) a declaration from Dr. Andrew Farah (Docket Entry 22-5 at 2), including as exhibits a neuropsychiatric review and report regarding Danita (id. at 4–7) and Dr. Farah's curriculum vitae (id. at 8–16), and (v) a declaration from Brian Clarke

(Docket Entry 22-6 at 2), including as exhibits an expert report (id. at 4-9) and Clarke's curriculum vitae (id. at 10-11).

As relevant to the Section 1983 Claim, the record reflects the following:

## A. The Vehicle

Sometime in early December 2018, Anthony approached Plaintiffs about buying the Vehicle, which sat inoperable in Plaintiffs' driveway. (See Docket Entry 22-2 at 4-7; see also id. at 4 (identifying license plate of Vehicle as XRS 6982).) Plaintiffs told Anthony about the Vehicle's undiagnosed mechanical problems, and they agreed that he could tow the Vehicle to "wherever he work[ed] on vehicles" (id. at 5; see id. at 4-5). Unbeknownst to Plaintiffs, Anthony rendered the Vehicle operable (see id. at 5), after which point "[James] stole the keys" (id.). On December 24, 2018, Anthony advised Plaintiffs that James had used the Vehicle without permission and "totaled it" (id.; see also Docket Entry 22-3 at 5). On December 31, 2018, Danita contacted the Stokes County Sheriff's Office to report the unauthorized use of the Vehicle and received instructions to meet with a magistrate. (See Docket Entry 22-3 at 5-6.) During that meeting, Danita "told [the Magistrate] all the details about what had happened[,] . . . [and] he filled out the paperwork and had [her] sign everything." (Id. at 6.)

## B. The Incident and Investigation

While Jackson and Christian worked the overnight patrol shift on December 21, 2018 (see Docket Entry 19-1, ¶ 2; Docket Entry 19-

-11-

2, ¶ 2), a shoplifting occurred at a Sheetz convenience store (<u>see</u> Docket Entry 19-1, ¶¶ 3-5; Docket Entry 22-1 at 59). The Sheetz manager immediately reported the Incident to Jackson, who had stopped by the store to conduct a "security check" (Docket Entry 22-1 at 59). "[Jackson] accompanied [the manager] to the back office where [he] watched surveillance camera footage on a desktop computer." (Docket Entry 19-1, ¶ 3.) Jackson used his body-worn camera to capture his review of the surveillance video. (<u>See</u> Docket Entry 22-8.)

The manager described the perpetrator as a white male (Docket Entry 22-1 at 59), and the surveillance video depicted "a white male adult wearing a cap walking around the store while picking up what looked like candy items from the shelves" (Docket Entry 19-1, ¶ 4; <u>see also</u> Docket Entry 22-8). The video showed the perpetrator "place th[o]se items either inside the front of his pants or inside his jacket pocket." (Docket Entry 19-1, ¶ 4.) The video then depicted the perpetrator "remov[ing] a Natty Rush energy drink from the shelf and plac[ing] it too into the front of his pants" (<u>id.</u>) before going "to a cash register and pa[ying] for other items he was holding" (<u>id.</u>). A short time later, the perpetrator again entered the convenience store and concealed additional items, paying only for a bag of chips. (<u>See</u> <u>id.</u>, ¶ 5.)

"[Jackson] used [his] cellphone to take two photo[graph]s of the [perpetrator] on the surveillance video" (<u>id.</u>, ¶ 6 (referencing Docket Entries 19-4, 19-5)). During that process, Jackson

-12-

complained that "the cap on [the perpetrator's] head prevented [Jackson] from having a clear view of his full face." (Id.)  The Surveillance Photographs depict the perpetrator's clothing (see Docket Entry 19-4) and the lower half of his face, including his nose, mouth, and facial hair (see Docket Entry 19-5).

After the Sheetz manager advised Jackson about the color, make, model, and license plate of the vehicle used by the perpetrator (see Docket Entry 22-1 at 59 (identifying license plate as XRS 6982); see also Docket Entry 19-1, ¶ 6 (same)), Jackson "[u]s[ed] the computer in [his] patrol car [to run] that plate for any wa[rra]nts and to ascertain the registered owner" (Docket Entry 19-1, ¶ 6).  As a result, Jackson identified Plaintiffs as the registered owners of the Vehicle, "ran a driver's license inquiry on Greg[, ]and pulled up the color image of his driver's license photo[graph]" (id. (referencing Docket Entry 19-6)).

> [Jackson] immediately noted [Greg]'s resemblance to the [perpetrator].  Both men appeared to be middle-age white males with moustaches and beards.  Although the [perpetrator]'s cap covered the hair on top of his head, [Jackson] could see that he and [Greg] both had reddish facial hair with similar patches of grayish hair on the chin and splits in the mustache.  The men's nose structure also appeared similar.

(Id.)

Jackson asked Christian, the shift sergeant, to meet him at Sheetz to provide a second opinion regarding his identification of Greg as the perpetrator.  (See id., ¶ 7; accord Docket Entry 19-2, ¶¶ 2–3.)  "When [] Christian arrived and compared the [Surveillance

-13-

Photographs] with the [License Photograph], he agreed they appeared
to be the same person" (Docket Entry 19-1, ¶ 7; accord Docket Entry
19-2, ¶ 4).  Jackson declined to interview other law enforcement
officers (employed by different agencies) present at the time of
the Incident to ask them about the perpetrator (see Docket Entry
22-1 at 52 (Jackson denying recollection of any such
conversations)) and refrained from asking Sheetz employees working
at the time of the Incident whether they believed that the License
Photograph depicted the perpetrator (see id. at 39-40, 42-43).

Jackson also decided not to travel to Plaintiffs' residence at
that time, given the late hour and the fact that Plaintiffs lived
approximately nine miles away, outside the city limits of King.
(See Docket Entry 19-1, ¶¶ 6, 8.)  As to that second consideration,
only Jackson and Christian remained on duty at the time (see id.,
¶ 8; accord Docket Entry 19-2, ¶ 6), and Christian deemed it
necessary for both "to remain in the City so [they] could respond
to priority calls together and/or simply back each other up on
things like traffic stops" (Docket Entry 19-2, ¶ 6).  Jackson
further chose not to seek assistance from the Stokes County
Sheriff's Office in locating Greg or otherwise determining whether
Greg operated the Vehicle on the night of the Incident.  (See
Docket Entry 22-1 at 49-51.)

### C. The Warrant and Arrest

Jackson conducted no additional investigation into the
Incident before seeking criminal charges against Greg.  (See id. at

-14-

28.)  In the early morning hours of December 24, 2018 (see id.), during another one of his overnight patrol shifts, "[Jackson] connected by video at the police department with Stokes County Magistrate Lane" (Docket Entry 19-1, ¶ 9).  Jackson told Magistrate Lane, under oath, about his investigation into the Incident, "including what [he] observed on the surveillance camera video of the [perpetrator]'s actions inside Sheetz, followed by [his] comparison of the facial images of the [perpetrator] with the driver's license photo[graph] of the registered owner of the getaway vehicle" (id.).  Jackson swore as to "the similarities [he] saw regarding the reddish hair in both men's beards, splits in both mustaches, and similar patches of grayish hair on both chins" (id.; see also Docket Entry 22-1 at 34; but see Docket Entry 22-1 at 33 (denying recollection regarding beard)), but he did not tell Magistrate Lane about the perpetrator's hat or his inability to see the perpetrator's full face (see Docket Entry 22-1 at 29, 35).[7] Nor did Jackson "try holding up photocopies of the images that [] Christian and [Jackson had] viewed, as the common practice in Stokes County was for magistrates to make charging decisions based upon an officer's sworn testimony as opposed to consideration of

_____

[7] Jackson denied knowledge of any recording documenting his presentation to Magistrate Lane (see id. at 30), and the record reveals none, such that evidence on that point derives from Jackson's recollection (see id. at 28-35).  During his deposition, Jackson asserted an inability to recall whether he told Magistrate Lane about his comments during his review of the surveillance video or about his solicitation of a second opinion from Christian.  (See id. at 29.)

-15-

documentary evidence." (Docket Entry 19-1, ¶ 9.)[8]  During that presentation, Jackson expressed no preference for an arrest warrant (as opposed to a criminal summons).  (Id., ¶ 10.)  Ultimately, "Magistrate Lane issued [the W]arrant[] charging [Greg] with larceny, possessing stolen goods, and concealment of merchandise." (Id.)

On February 21, 2019, Sawyers arrived at Plaintiffs' residence to serve the Warrant on Greg.  (See Docket Entry 19-7 at 5–6.) After Danita expressed some confusion about the purpose for Sawyers's visit (see Docket Entry 22-3 at 10–11), Sawyers directed her to call Greg and tell him to come home (see id. at 11).  Danita complied, placing the call on speakerphone so that Greg could talk to Sawyers.  (See id.)  Plaintiffs asked Sawyers for more information, but he denied knowledge, explaining that he thought the Warrant pertained to an incident at Walmart.  (See id. at 11–12; Docket Entry 22-2 at 12–13.)  Sawyers eventually agreed that Greg could submit to arrest at the Magistrate's office.  (See Docket Entry 19-7 at 7.)  Greg arranged to leave work, advised his supervisor about the situation, and drove home.  (See Docket Entry 22-2 at 13.)

Plaintiffs traveled together to the courthouse, where they arrived before Sawyers.  (See Docket Entry 22-3 at 12–13.)  While

---

[8]  Although he generally disclaimed recollection, Jackson explained that, consistent with common practice, he would not have shown Magistrate Lane the surveillance video or his body-worn camera video.  (See Docket Entry 22-1 at 32–33.)

they waited, Danita spoke to someone in the Magistrate's office in an (unsuccessful) attempt to clarify that Greg had not committed the offenses charged in the Warrant. (See id. at 14–15.) A short time later, Sawyers arrived with an intoxicated detainee (see id. at 15) who "had vomited all over the backseat and the floorboard [of Sawyers's vehicle]" (id. at 13).

Sawyers encountered Plaintiffs when he entered the building with the other detainee. (See Docket Entry 22-2 at 16–17.) After Greg identified himself to Sawyers, Sawyers handcuffed him and provided his Miranda rights. (See id.; Docket Entry 22-3 at 16.) Danita then professed her belief in Greg's innocence (see Docket Entry 22-2 at 21; Docket Entry 22-3 at 16) and tried to accompany Greg as Sawyers led him down a hallway toward the Magistrate's office, but she received instructions to wait outside (see Docket Entry 22-3 at 16). While Danita sat alone, in distress about the situation (see id. at 17), Greg and the other detainee entered the Magistrate's office, where the latter continued to vomit (see Docket Entry 22-2 at 17).

After handling the matter concerning the other detainee, the Magistrate spoke to Greg about the Warrant. (See id. at 17–19.) Greg answered some unspecified questions from the Magistrate and then received a $500 unsecured bond. (See id. at 19–21.) At that time, Greg did not know that the Warrant related to the Incident at Sheetz. (See id. at 19–20; see also id. at 20 (Greg recalling only that Magistrate advised him about misdemeanor larceny charge).)

-17-

Thereafter, Greg went to "the jail area for processing" (Docket Entry 19-7 at 17–18), where unnamed employees obtained his "electronic fingerprints" and photographs (see id. at 18). Approximately 45 minutes after speaking with the Magistrate (see id.), Greg returned to the hallway where Danita sat waiting for him, "full of tears running down her face" (id. at 19; see also id. at 17 (Greg describing Danita as "in total meltdown")). Sawyers then removed the handcuffs and told Greg he could leave. (See id. at 19.)

### D. Expungement

In the days that followed Greg's arrest, Plaintiffs attempted to locate a police officer to assist them with the situation. (See Docket Entry 22-3 at 18.) On or about February 25, 2019, Hale "me[t] with [Plaintiffs] at [his] office at the [] Department" (Docket Entry 22-4, ¶ 4; see also Docket Entry 22-3 at 18). Danita explained the events surrounding the Warrant, including her "belie[f] that James [] was the responsible party and that he had stolen the [Vehicle]." (Docket Entry 22-4, ¶ 4; see also Docket Entry 22-3 at 19.) Hale reviewed the Incident Report as well as the Surveillance Photographs (see Docket Entry 22-4, ¶ 5), took a photograph of Greg (see Docket Entry 22-3 at 19), and concluded "immediately that the individual depicted in the [Surveillance P]hotograph[s] was not [Greg]" (Docket Entry 22-4, ¶ 5). In particular, Hale believed "that [Greg] weighed more than 100 pounds more than the suspect depicted in the [Surveillance

-18-

P]hotograph[s].” (Id.)  Hale told Plaintiffs he would contact them after conducting additional investigation.  (See id.; Docket Entry 22-3 at 19-20.)

The next day, Hale called Danita, advising her “that there was no question that the individual depicted in the [Surveillance P]hotograph[s] and in the Sheetz [surveillance] video was not Greg” (Docket Entry 22-4, ¶ 6; see Docket Entry 22-3 at 20-21).  “[Hale] further explained to [Danita] that an officer was required to have 51[ percent] probable cause before seeking an arrest warrant[,] . . . that [] Jackson had failed to perform his due diligence in performing a proper investigation[,] and that the [Department] would [] deal[] with [the matter] internally.” (Docket Entry 22-4, ¶ 6; see also Docket Entry 22-3 at 21.)  Hale also assured Danita that the Department would expunge the charges from Greg’s record (see Docket Entry 22-3 at 21), which expungement occurred several weeks later (see Docket Entry 22-2 at 26).

After Hale spoke with Danita, he informed Christian that James, not Greg, had committed the shoplifting at Sheetz.  (See Docket Entry 19-2, ¶ 7.)  “[Christian] advised [] Jackson of the situation and, at the direction of [] Hale, [] prepared a ‘to whom it may concern’ letter explaining [that] the police had [] concluded Greg [] did not commit the shoplifting in question and that another person was being charged.”  (Id.; see also Docket Entry 22-4 at 6 (copy of letter); but see Docket Entry 22-4, ¶ 7 (Hale averring that he prepared letter for Christian).)  Jackson

-19-

also signed a letter (prepared by Hale (see Docket Entry 22-4, ¶ 7)) that identified James as the perpetrator and acknowledged the mistaken identification of Greg (see Docket Entry 19-1, ¶ 12; see also Docket Entry 22-4 at 5 (copy of letter)). Hale "communicat[ed] to both [] Jackson and [] Christian that [] Jackson had messed up and failed to follow appropriate police procedure and investigative techniques by not having sufficient probable cause and by seeking an arrest warrant of Greg [] without conducting further investigation to determine that Greg [] was the suspect." (Docket Entry 22-4, ¶ 7.)

At some point, "[Jackson] appeared remotely before a Stokes County Magistrate to have [James] charged with the shoplifting at Sheetz." (Docket Entry 19-1, ¶ 11.) "[A]fter [Greg] secured a court order expunging the[] charges[ in the Warrant,] . . . [Jackson] receiv[ed] the order[,] logged into [the Department's] records management system[,] and substituted the word 'EXPUNGED' for [Greg]'s name wherever it appeared." (Id., ¶ 13.)

**E. Expert Submissions**

Clarke, "a retired law enforcement officer with 29 years of experience" (Docket Entry 22-6 at 4), prepared a report in connection with his review of the facts surrounding the Incident (to include some of the underlying evidence) (see id. at 5). After summarizing the relevant facts in a manner consistent with Subsections B and C above (see id. at 5-6), Clarke formulated the following opinions:

-20-

(1) "Jackson failed to use reasonable investigative techniques, contrary to his training, prior to appearing before the [M]agistrate on December 24[, 2018] to obtain a warrant for [Greg]" (id. at 6);

(2) "if [] Jackson had used his training and followed reasonable investigative techniques, he would have determined that [Greg] was not the suspect depicted in the Sheetz surveillance footage and on his body camera" (id.);

(3) "Jackson's application for a warrant lacked sufficient information and was not based on a complete investigation[,] such that no reasonable, well-trained officer would have requested an arrest warrant in similar circumstances" (id.);

(4) "Jackson's 'investigation' was so lacking, and error ridden as to be a significant and gross violation of generally accepted police practice and customs" (id.);

(5) "Jackson's actions in performing the limited, error filled investigation and seeking an arrest warrant reflected a reckless indifference to the rights of [Greg] that was contrary to [] Jackson's duty as a police officer" (id.); and

(6) "[] Jackson's actions reflect a lack of supervision by the City [] to prevent this type of incident" (id.).

In support of those opinions, Clarke noted that Jackson had failed to interview (i) the two Sheetz clerks with whom the perpetrator interacted during the Incident or (ii) the other law enforcement officers present inside the store at the time of the

-21-

Incident. (See id. at 7.) Clarke also described various physical differences between Greg and the perpetrator, suggesting that Greg, based on the License Photograph, appeared to outweigh the perpetrator by at least 50 pounds. (See id.) Moreover, according to Clarke, "a reasonable, well-trained officer knows that the owner of a vehicle is not always the operator of the vehicle." (Id.)

As far as the lack of subsequent investigation, Clarke asserted that "[a] reasonable and well-trained officer would have made some attempt th[e] night [of the Incident] to try and locate [Greg] at home, or at a minimum to contact [him] by phone." (Id.) Alternatively, Clarke opined that Jackson "should have[] requested that a Stokes County Sheriff['s] deputy be sent to [Plaintiffs'] residence." (Id. at 8.) Regarding the time that elapsed before Jackson presented the evidence to Magistrate Lane, Clarke stated that Jackson should "have used th[at] time to attempt to locate [Greg] at his home to verify [his] identity and interview him about the [I]ncident" (id.). With respect to the presentation of evidence, Clarke disagreed that Greg and James possessed "'distinctive' noses and beards" (id.; but see id. at 8 n.1 (acknowledging lack of clarity about precise contents of Jackson's presentation to Magistrate Lane)) and indicated that Jackson should have told Magistrate Lane about the limitations of the surveillance video and the absence of other investigative steps (see id.). Finally, Clarke maintained that "the City [] failed to provide adequate supervision to [] Jackson" (id. at 9) and that, "[h]ad the

-22-

City [] provided adequate supervision, then [] Jackson may not have made the numerous errors and missteps that [Clarke ] identified in []his report" (id.).

**DISCUSSION**

**I. Section 1983 Claim**

**A. Legal Standards**

    1. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith,

-23-

597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

"However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08CV2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (unpublished) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). In response to a summary judgment motion, "the nonmoving party [must] go beyond the pleadings and[,] by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted). Factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise

-24-

made under penalty of perjury.  See Reeves v. Hubbard, No. 1:08CV721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011) (unpublished), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

       2. Section 1983

       a. Fourth Amendment

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996). A Section 1983 claim stemming from a seizure pursuant to a warrant but without probable cause "incorporates certain elements of the common[-]law tort [of malicious prosecution]." Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000).[9] "To prove such a claim, a plaintiff must show 'that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [the] plaintiff's favor.'" Hupp v. Cook, 931 F.3d 307, 324 (4th Cir. 2019) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).[10]

_____

[9] "While it is not entirely clear whether the Constitution recognizes a separate constitutional right to be free from malicious prosecution, if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure." Snider v. Seung Lee, 584 F.3d 193, 199 (4th Cir. 2009) (internal citations omitted)).

[10] Although some plaintiffs (and courts) have adopted the malicious-prosecution label in analyzing such claims under Section

-25-

"[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (internal quotation marks omitted). "Probable cause requires more than bare suspicion but . . . less than evidence necessary to convict. It is an objective standard of probability that reasonable and prudent persons apply in everyday life. Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998) (internal citation and quotation marks omitted). Under that standard, "when it is considered in the light of all of the surrounding circumstances, even seemingly innocent activity may provide a basis for finding probable cause." Id. (internal quotation marks omitted). Moreover:

> Because probable cause is an objective test, [courts] examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; [courts] do not examine the subjective beliefs of the arresting officers to determine whether *they* thought that the facts constituted probable cause.

United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998). In other words, "[w]hether a Fourth Amendment violation has occurred turns

---

1983, see Thompson v. Clark, __ U.S. __, __, 142 S. Ct. 1332, 1337 (2022), others have described the claim as "unreasonable seizure pursuant to legal process," id. This Opinion opts for the latter term because Plaintiffs have not used the malicious-prosecution label and because the existence (or absence) of probable cause constitutes the only element in dispute.

on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (internal citation and quotation marks omitted).

With the benefit of hindsight, a litigant may "contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all the steps a police officer *might* have taken that *might* have shaken his belief in the existence of probable cause." Torchinsky v. Siwinski, 942 F.2d 257, 264 (4th Cir. 1991). In other words, "a reasonable officer [need not] exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." Id.; see also Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000) ("Although an officer may not disregard readily available exculpatory evidence of which he is aware, the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause."). Moreover, the Fourth Amendment imposes no obligation on "an affiant to include all potentially exculpatory evidence in [an] affidavit [supporting an application for an arrest warrant]," United States v. Colkley, 899 F.2d 297, 302 (4th Cir. 1990).

However, an officer may not "deliberately[,] or with a 'reckless disregard for the truth[,]' ma[k]e material false statements in his affidavit, or omit[] from that affidavit 'material facts with the intent to make, or with reckless disregard

-27-

of whether they thereby made, the affidavit misleading.'" <u>Miller</u>
<u>v. Prince George's Cnty.</u>, 475 F.3d 621, 627 (4th Cir. 2007)
(quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978), and <u>Colkley</u>,
899 F.2d at 300).[11]  "'Reckless disregard' can be established by
evidence that an officer acted 'with a high degree of awareness of
[a statement's] probable falsity,' that is, 'when viewing all the
evidence, the affiant must have entertained serious doubts as to
the truth of his statements or had obvious reasons to doubt the
accuracy of the information he reported.'"  <u>Id.</u> (brackets in
original) (quoting <u>Wilson v. Russo</u>, 212 F.3d 781, 788 (3d Cir.
2000)).  In contrast, omissions attributable to "negligence or
innocent mistake" lack constitutional significance.  <u>See</u> <u>id.</u> at
627–28.

        "If — and only if — there is a [deliberate or reckless]
misrepresentation [or omission], the analysis then focuses on
materiality of that misrepresentation [or omission]."  <u>Unus v.</u>
<u>Kane</u>, 565 F.3d 103, 124 (4th Cir. 2009) (citing <u>Franks</u> and <u>Miller</u>).
"To determine materiality, a court must 'excise the offending
inaccuracies and insert the facts recklessly omitted, and then
determine whether or not the "corrected" warrant affidavit would
establish probable cause.'"  <u>Miller</u>, 475 F.3d at 628 (quoting

---

        [11] The United States Court of Appeals for the Fourth Circuit
has characterized <u>Miller</u> as "extending *Franks* to [Section] 1983
claims," <u>Evans</u>, 703 F.3d at 650; <u>see</u> <u>id.</u> at 649–52 (addressing
claim that "seizures [] violate[d] the Fourth Amendment because
[order authorizing seizures] flowed from the officers' assertedly
dishonest supporting affidavits").

_Wilson_, 212 F.3d at 789). To qualify as material, "an omission must do more than potentially affect the probable[-]cause determination: it must be 'necessary to the finding of probable cause.'" _Colkley_, 899 F.2d at 301 (quoting _Franks_, 438 U.S. at 156).

### b. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" _Pearson v. Callahan_, 555 U.S. 223, 231 (2009) (quoting _Harlow v. Fitzgerald_, 457 U.S. 800, 818 (1982)). When a defendant invokes qualified immunity at summary judgment, claims subject to that defense may proceed to trial only if "(1) [] the official violated a statutory or constitutional right, and (2) [] the right was 'clearly established' at the time of the challenged conduct." _Ashcroft v. al-Kidd_, 563 U.S. 731, 735 (2011). "Plaintiffs bear the burden of proof to show that a constitutional violation occurred," _Mays v. Sprinkle_, 992 F.3d 295, 302 n.5 (4th Cir. 2021), whereas "defendants bear the burden of showing that the violation was not clearly established, and [that] they are therefore entitled to qualified immunity," id. With respect to that second prong, the analysis focuses on "clearly established" precedent "'particularized' to the facts of the case," _White v. Pauly_, 580

-29-

U.S. 73, __, 137 S. Ct. 548, 552 (2017), rather than "at a high level of generality," Ashcroft, 563 U.S. at 742.

In connection with the qualified-immunity analysis, courts may "'exercise their sound discretion' and decide which issue to first address." Williamson v. Stirling, 912 F.3d 154, 186 (4th Cir. 2018) (quoting Pearson, 555 U.S. at 236); see also Pearson, 555 U.S. at 236 (classifying as "often appropriate" decision to begin with question of whether constitutional violation occurred). If a plaintiff fails to demonstrate that a constitutional violation occurred, courts need not consider whether any such violation, if shown, would have contravened clearly established law. See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007) ("If [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there.").

As relevant to the second prong, the clearly established law applicable here, "[t]he right at issue . . . is not the general right to be free from arrest without probable cause, but rather the right to be free from arrest under the particular circumstances of the case." Graham v. Gagnon, 831 F.3d 176, 182 (4th Cir. 2016). "The test, strictly parsed, comes out in the arrest context to whether it was reasonable to believe that there was a reasonable basis, i.e., probable cause, to believe that an offense had been

-30-

committed." <u>Sevigny v. Dicksey</u>, 846 F.2d 953, 956 n.3 (4th Cir. 1988) (recognizing "'double-counting' feature of the test"). "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" <u>Messerschmidt v. Millender</u>, 565 U.S. 535, 546 (2012) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 922–23 (1984).

However, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional . . . seizure does not end the inquiry into objective reasonableness." <u>Id.</u> at 547; <u>see also</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 346 n.9 (1986) ("[I]t is different if no officer of reasonable competence would have requested the warrant . . . ."). For example, "a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." <u>Smith v. Reddy</u>, 101 F.3d 351, 355 (4th Cir. 1996). Moreover, an officer lacks entitlement to qualified immunity when he fails to "avail himself of readily available information that would have clarified matters to the point that [the criminal charges] would have been flatly ruled out as factually unsupportable." <u>Sevigny</u>, 846 F.2d at 957–58 (affirming denial of qualified immunity to officer who effected warrantless arrest of suspect for two offenses that depended on inconsistent theories of culpability).

-31-

**B. Analysis**

1. Preliminary Matters

The parties have offered divergent views about how the Court should analyze the Section 1983 Claim against the backdrop of qualified immunity. According to Defendants, Plaintiffs bear the "burden to overcome [ D]efendant[s'] presumptive entitlement to qualified immunity" (Docket Entry 20 at 11), which Plaintiffs supposedly cannot do because "no preexisting 'clearly established' case law prohibit[ed] the seeking of arrest warrants where the registered owner of a getaway car shares the same pattern and color of facial hair as the suspect who committed the crime and drove off" (id. at 12). (See also Docket Entry 23 at 8–10.) Without explicitly allocating the burden to prove (or disprove) the defense of qualified immunity (see Docket Entry 22 at 19–20), Plaintiffs have contended that Jackson lacks entitlement to the same because (i) he violated Greg's fourth-amendment rights by recklessly misstating and omitting material information in pursuit of the Warrant, which no reasonable officer would have sought (see id. at 20), and (ii) clearly established precedent holds that "a police officer [may not] deliberately, or with reckless disregard for the truth, [] make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause" (id. (internal quotation marks omitted) (quoting Swick v. Wilde, No. 1:10CV303, 2012 WL 3780350, at *15 (M.D.N.C. Aug. 31, 2012)

-32-

(unpublished), <u>appeal dismissed and remanded</u>, 529 F. App'x 353 (4th Cir. 2013))).

Both parties have (partially) missed the mark.  Contrary to Defendants' assertion, "[P]laintiff[s] bear[] the burden on the first prong [of qualified immunity, i.e., to show that a constitutional violation occurred], and [Defendants] bear[] the burden on the second prong [i.e., to show that no clearly established precedent put Jackson on notice of such violation]." <u>Stanton v. Elliott</u>, 25 F.4th 227, 233 (4th Cir. 2022) (citing <u>Henry v. Purnell</u>, 501 F.3d 374, 377-78 & n.4 (4th Cir. 2007)); <u>see also</u> <u>id.</u> at 233 n.5 (discussing intra-circuit split and noting possible effect of <u>Saucier</u>).  In <u>Saucier</u>, the United States Supreme Court clarified that qualified immunity depends in part on "whether a constitutional right would have been violated on the facts alleged," <u>Saucier</u>, 533 U.S. at 200, which decision the United States Court of Appeals for the Fourth Circuit has described as "splitting [] the defense into a two-step inquiry," <u>Stanton</u>, 25 F.4th at 233 n.5.[12]  For their part, Plaintiffs have defined the

_____

[12] Although Defendants have cited authority to support the proposition that a plaintiff must "overcome the defendant official's qualified immunity [] by showing that th[e violated constitutional or statutory] rights were clearly established at the time of the conduct at issue" (Docket Entry 20 at 12 (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 197 (1984))), the <u>Davis</u> court confronted the question of whether "a state official loses his qualified immunity from suit for deprivation of federal constitutional rights if he is found to have violated the clear command of a state administrative regulation," <u>Davis</u>, 468 U.S. at 185, answering that question in the negative, <u>see</u> <u>id.</u> at 194.  The decision in <u>Davis</u>, which preceded <u>Saucier</u> by almost two decades, neither identified

-33-

supposedly violated right "at a high level of generality," Ashcroft, 563 U.S. at 742, despite the fact that the qualified-immunity analysis properly focuses on precedent "'particularized' to the facts of the case," White, 580 U.S. at __, 137 S. Ct. at 552. (See Docket Entry 22 at 20.)

In any event, the foregoing disputes have no effect on the first qualified-immunity prong (whether a constitutional violation occurred), with which question the Court elects to begin and which violation Plaintiffs bear the burden to establish. The answer depends on whether probable cause existed to support the seizure of Greg, an issue to which the Court now turns.

---

the "prongs" of qualified immunity nor allocated the burden of proving either prong. In the intervening 20 years, the Supreme Court has not answered the "surprisingly tricky question . . . [of w]ho bears the burden on qualified immunity," Stanton, 25 F.4th at 233 n.5 (identifying four ways to allocate burden and citing authority that "collect[s] cases going in each direction"). In the Fourth Circuit, however, the prevailing view remains clear. See id. at 233.

## 2. Existence of Probable Cause[13]

Defendants have argued that Jackson developed probable cause on the night of the Incident, contending that he reasonably relied on the surveillance video depicting the resemblance between Greg and the perpetrator, as well as the fact that Greg owned the Vehicle. (See Docket Entry 20 at 8-11; see also id. at 10-11 (emphasizing that probable-cause standard demands less certainty than preponderance of evidence).) In response, Plaintiffs have insisted that neither the (unclear) surveillance video nor Greg's

---

[13] Some courts appear to afford a presumption of reasonableness to seizures effected pursuant to warrants and require plaintiffs to present evidence of a Franks violation as a threshold matter. See, e.g., Patterson v. Lawhorn, 1:15CV477, 2016 WL 3922051, at *10-13 (E.D. Va. July 20, 2016) (unpublished) (citing, inter alia, Torchinsky), aff'd, 685 F. App'x 258 (4th Cir. 2017); but see Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 171 n.2 (4th Cir. 2016) (explaining that "presumption in Torchinsky [] was not a presumption that probable cause existed, but a presumption of the reasonableness of the officer's reliance on the arrest warrant"). Other courts have viewed a Franks violation as relevant to the question of whether "subsequent acts of independent decision-makers (e.g., prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." Mead v. Shaw, 716 F. App'x 175, 178 (4th Cir. 2018) (internal quotation marks omitted) (quoting Evans, 703 F.3d at 648, and determining that, absent evidence of a Franks violation, "the probable[-]cause determinations of third parties were the proximate cause of [the plaintiff]'s arrest and detention"). Because Defendants have not advanced either argument (see Docket Entry 20 at 11-13 (referencing Warrant only in connection with discussion of second prong of qualified immunity); Docket Entry 23 at 1-3 (arguing that no triable issue exists as to any deliberate or reckless misstatement or omission by Jackson)), this Opinion addresses the existence of probable cause without applying any presumption and before considering any Franks question.

status as one of the registered owners of the Vehicle could establish probable cause. (See Docket Entry 22 at 14–17.)

Probable cause existed if the facts and circumstances known to Jackson at the time qualified as "sufficient to warrant a prudent man in believing that [Greg] had committed . . . an offense," Beck v. Ohio, 379 U.S. 89, 91 (1964). Shortly after the Incident, Jackson learned that a white male suspect had stolen certain items from a Sheetz convenience store and then drove away in the Vehicle. Jackson relied on information about the Vehicle, including its license plate, to identify Greg and Danita as its registered owners. Based on that (undisputed) fact alone, absent "information negating [the] inference that the owner is the driver of the vehicle," Kansas v. Glover, __ U.S. __, __, 140 S. Ct. 1183, 1186 (2020), an officer in Jackson's position would have possessed "more than reasonable suspicion" to stop the Vehicle, id. at __, 140 S. Ct. at 1188 (explaining that officer possessed "more than reasonable suspicion to initiate [a] stop" when he observed vehicle in roadway and knew that registered owner lacked valid license).[14]

---

[14] The Supreme Court acknowledged that "the presence of additional facts might dispel reasonable suspicion," id. at __, 140 S. Ct. at 1191, positing (for example) that an officer might "know[] that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties," id. (emphasis added). However, the Glover Court remained silent about the obligation to collect such additional facts. See id.

-36-

Although probable cause demands a stronger showing than reasonable suspicion, see id., Jackson possessed more information than the mere status of Greg and Danita as the registered owners of the Vehicle. Jackson reviewed the surveillance video from Sheetz, which depicted the perpetrator as he concealed items and left the store without paying for them. In an attempt to identify the perpetrator, Jackson captured the Surveillance Photographs as he watched the surveillance video and subsequently compared them to the License Photograph, concluding that Greg resembled the perpetrator in several respects. Plaintiffs have quibbled over the degree of resemblance between the two men, based on those images, but they have conceded at least some general similarities. (See Docket Entry 22 at 14 (acknowledging that Surveillance Photographs and License Photograph depict white men with facial hair); but see id. at 14 n.4 (suggesting that factual dispute exists "as to whether the [perpetrator] and Greg[ as depicted in the L]icense [P]hoto[graph] bare [sic] any similarities" (emphasis added)).)[15] The acknowledged similarities, when paired with the reasonable inference that individuals generally drive their own vehicles, constituted probable cause to support the seizure of Greg.

------

[15] Moreover, while glossing over the significance of the basic, uncontested similarities in physical appearance, Plaintiffs have decried the possibility that probable cause could derive solely from "vehicle registration" (Docket Entry 22 at 17) or "[t]he fact that the DMV records identified Greg as a registered owner of the [Vehicle]" (id.). This Opinion reaches no such result.

-37-

Other courts have reached conclusions consistent with that determination. For example, when an undercover agent mistakenly identified a woman as the individual who had sold him marijuana during a controlled purchase, probable cause supported the arrest warrant, despite the fact that the agent ultimately discovered his mistake upon seeing the arrestee at her first court appearance. See Thompson v. Prince William Cnty., 753 F.2d 363, 364–65 (4th Cir. 1985) (explaining that government dismissed charges upon notification that arrest warrant charged wrong person). In reaching that decision, the Thompson Court rejected the notion that "slight discrepancies of height (5′ 5″ as against 5′ 7″) and weight or in color of eyes (blue versus brown) and hair (blond as opposed to brown)," id. at 365, could undermine the "other strong indications" that the agent had identified the correct suspect. See id. (noting that agent had observed suspected seller of marijuana driving vehicle registered to person who shared seller's first name and that informant had identified driver by same first name).[16]

---

[16] Even basic similarities may rise to the level of probable cause, when viewed in conjunction with other facts and circumstances connecting an individual to a suspected crime. See Gray, 137 F.3d at 770 (discerning probable cause based on fact that "witness identified [arrestee] as resembling one of the [suspects]," together with facts that arrestee possessed firearm involved in criminal activity and shared first name with street name of suspect (emphasis added)); see also Bennett v. Vidal, 267 F. Supp. 3d 487, 494–96 (S.D.N.Y. 2017) (deciding, on qualified-immunity grounds, that "arguable probable cause" supported arrest when black male arrestee, seized in proximity to armed chase observed by officer, wore clothing similar to black male suspects).

-38-

In contrast, an officer lacked probable cause when he sought an arrest warrant for a woman who (i) possessed prior convictions for selling crack cocaine, see Smith v. Munday, 848 F.3d 248, 251 (4th Cir. 2017), (ii) shared a "common race, common gender, and unfortunately common name," id. at 252, with an individual who had sold crack cocaine to a confidential informant, see id. at 251–52, and (iii) incurred arrest eleven miles from the site of that controlled purchase, see id. at 252. The Smith court noted that the officer had identified the arrestee as the suspect by searching police databases for residents of a particular county with a criminal record and the same name as the suspect, without any reason to believe that the suspect possessed a criminal history or resided in the county searched. See id. at 251. Moreover, although that search produced at least three results matching the officer's criteria, see id., "he chose one [i.e., the arrestee] for no immediately apparent reason," id. at 253. Given that the officer undertook no other investigation, he lacked any "evidence about [the arrestee's] conduct, let alone whether she was a participant in, connected to, or even physically present near the drug sale in question." Id. at 254.

Here, as in Thompson, even assuming the existence of some discrepancies in height, weight, hair color, and eye color, Jackson possessed probative evidence tying Greg to the Incident: the perpetrator departed from the Incident in a vehicle Greg owned. Also, unlike in Smith, where the identification itself stemmed from

-39-

unfounded assumptions about the suspect's criminal history and residence and where generic characteristics provided the <u>sole</u> connection between the arrestee and the suspect, such characteristics here supported probable cause only in connection with the reasonable inference that Greg operated the Vehicle on the night of the Incident.

All of Plaintiffs' contrary arguments fall short. First, to the extent Plaintiffs have suggested that Jackson's failure to conduct additional investigation vitiated probable cause (<u>see</u> Docket Entry 22 at 14-17), Plaintiffs have relied on non-binding, distinguishable authority (<u>see</u> <u>id.</u> at 15 (discussing <u>Sornberger v. City of Knoxville</u>, 434 F.3d 1006 (7th Cir. 2006))). In <u>Sornberger</u>, the United States Court of Appeals for the Seventh Circuit determined that the following "factors known to the officers who arrested Scott[, who asserted an unreasonable-seizure claim based on his arrest for a bank robbery] . . . undermine[d] substantially the determination of probable cause," <u>id.</u> at 1014:

> First, Scott did not match — or even come close to matching — the physical description of the [bank] robber that was provided by the only eyewitness who saw the robber's face. Secondly, [a] bank employee who knew Scott told the police that, at certain angles of the surveillance footage, the suspect did not resemble Scott. Third, the camera footage itself lacked a clarity of resolution that made it difficult to discern significant detail.

<u>Id.</u> (internal citation omitted).

Despite the foregoing uncertainties and the fact that Scott had offered an alibi (i.e., use of a computer at his parents' home

when the robbery occurred), officers sought to arrest him "during the execution of the search warrant for Scott's parents' computer," id. at 1011, instead of awaiting the results of that search to corroborate (or invalidate) Scott's alibi, see id. at 1016 (deeming arrest "unreasonably premature"). Moreover, the record supported "the view that the officers themselves realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing Scott's arrest." Id. The Seventh Circuit ultimately decided that neither the existence of probable cause nor the officers' entitlement to qualified immunity lent itself to summary adjudication. See id. at 1014-16.

The decision in Scott squares with the principle that "an officer may not disregard readily available exculpatory evidence of which he is aware," Wadkins, 214 F.3d at 541. Consistent with that principle, the Seventh Circuit noted that, in light of the lack of clarity about "who committed the crime," Sornberger, 434 F.3d at 1016, "reasonable avenues of investigation must be pursued," id. (internal quotation marks omitted). However, although the Incident and the bank robbery in Scott both led to scrutiny of "grainy surveillance video," id. at 1015, that similarity alone offers weak support for the position that the Fourth Amendment obligated Jackson to conduct additional investigation of the Incident.

The identification of Greg also differed in significant respects from the identification in Scott. For example, the officers in Scott initially relied on physical characteristics (as

-41-

described by a witness and as captured on the surveillance video) to inculpate Scott, whereas (unchallenged) information about the Vehicle led Jackson to identify Greg as a suspect. Additionally, the eyewitness in Scott "described the perpetrator as male, 5'9", approximately 160 pounds, dark complected, dark eyes, dark hair, clean shaven and in his thirties." Id. at 1010. "When the police found Scott [the evening of the robbery], he stood 5'11", had blond hair, blue eyes, a fair complexion and a mustache." Id. Those discrepancies, when paired with Scott's alibi, would alert a reasonably prudent officer to the need for further investigation. Here, in contrast, Greg's "fuller and heavier [face]" (Docket Entry 22 at 16) in the License Photograph (when compared to the face of the perpetrator in the Surveillance Photographs) constitutes the primary (potentially) exculpatory evidence available to Jackson. Neither that distinction nor Jackson's inability to observe the perpetrator's full face, eyes, or hair defeated probable cause, thus rendering further investigation constitutionally unnecessary.

Second, insofar as Plaintiffs have assigned significance to the criticisms voiced by Jackson during his review of the surveillance video (see id.), Jackson's subjective assessment of whether probable cause existed bears no relevance here, see Graham, 831 F.3d at 185 ("We have repeatedly explained that an officer's subjective belief is not legally relevant to the probable[-]cause analysis."); see also Robinson v. City of S. Charleston, 662 F. App'x 216, 220 (4th Cir. 2016) ("Under the correct Fourth Amendment

-42-

standard, how the individual defendants subjectively interpreted the surveillance video is not a 'material fact.'").[17]

Third, regarding Plaintiffs' challenge grounded in the fact that Jackson consulted Christian for a second opinion as to whether the perpetrator in the Surveillance Photographs resembled Greg as depicted in the License Photograph (see Docket Entry 22 at 7), the Court notes that Plaintiffs also have criticized Jackson for failing to consult individuals present during the Incident who may have observed the perpetrator (see id. at 6; see also id. at 16 (arguing that Jackson's failure to interview Sheetz employee "compound[ed]" supposed errors in investigation)). In other words, according to Plaintiffs, proof of the absence of probable cause lies in (A) the fact that Jackson sought a second opinion and (B) the fact that Jackson did not seek additional opinions. Under that theory, any interview with a potential witness or consultation with a superior would constitute a double-edged sword.[18] Moreover,

_____

[17] Because this Opinion addresses only whether a constitutional violation occurred, the Court need not reach the second qualified-immunity question, i.e. the objective reasonableness of Jackson's belief in the existence of probable cause. See McKinney v. Richland Cnty. Sheriff's Dep't, 431 F.3d 415, 418 n.2 (4th Cir. 2005) ("If the warrant was supported by probable cause, then [the plaintiff]'s Fourth Amendment rights were not violated, regardless of whether [the officer]'s belief that there was probable cause was reasonable.").

[18] Although the analysis in this Opinion addresses only the first qualified-immunity prong, the Court notes that consulting a superior before obtaining a warrant reflects a degree of caution that may evince objective reasonableness (as relevant to the second qualified-immunity prong). See, e.g., Merchant v. Bauer, 677 F.3d 656, 663–64 (4th Cir. 2012) (denying qualified immunity but noting,

-43-

even if the consultation with Christian indicates that Jackson doubted whether probable cause existed, any such subjective doubt remains irrelevant here.  See Graham, 831 F.3d at 185.

### 3. Franks Violation

As already mentioned, Defendants have relied on the existence of the Warrant for the purpose of demonstrating Jackson's entitlement to qualified immunity (on the second prong).  (See Docket Entry 20 at 11–13.)  In response, Plaintiffs have asserted that "[a] magistrate's issuance of a warrant [] does not shield an officer from liability if the application for the warrant fails to show probable cause."  (Docket Entry 22 at 13; see id. (discussing Miller).)  In that vein, Plaintiffs have argued "that Jackson deliberately or recklessly falsely positively identified Greg as the suspect and omitted material facts from his testimony to the Magistrate."  (Id. at 14.)  More specifically, Plaintiffs have suggested that Jackson, with reckless disregard for the truth, (i) informed the Magistrate that he had identified Greg as the suspect (see id. at 18 (challenging quality of evidence available to Jackson and characterizing his performance as violative of "generally accepted police practice and custom")), and

"[t]o his credit, [the o]fficer [] sought to corroborate his probable[-]cause analysis by seeking advice from a deputy Commonwealth's Attorney and relying on the magistrate's evaluation of his warrant application"); Torchinsky, 942 F.2d at 263 ("A reasonable officer in [the defendant]'s position could view [] consultations with [a supervisor] as additional confirmation that probable cause was present.").

(ii) neglected to tell the Magistrate about the (poor) quality of the surveillance video, his contemporaneous (doubt-evincing) comments while viewing it, and his reliance on Christian for a second opinion (see id. at 18–19).  In reply, Defendants have characterized Plaintiffs' discussion of Miller as presenting an (unsuccessful) "alternative basis for liability" (Docket Entry 23 at 2 (emphasis added)).

Putting aside any questions about the various ways the parties have framed the significance of the supposed Franks violation, Plaintiffs have failed to identify a triable issue on "whether Jackson deliberately, or with a reckless disregard for the truth, made a false statement in his testimony to the Magistrate or omitted material facts either with intent or with a reckless disregard as to whether they made his testimony misleading" (Docket Entry 22 at 13).  As concerns the identified omissions, the Fourth Circuit has cautioned against "open[ing] officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to [an arrestee]'s benefit."  Colkley, 899 F.2d at 301.  With respect to the supposed misstatement (see Docket Entry 22 at 18 ("There is no dispute [Jackson's] testimony [identifying Greg as the suspect] was false.")), Jackson indeed erred in his identification of Greg as the perpetrator; however, that mistake alone fails to establish Jackson's mental state at the pertinent time.  See Miller, 475 F.3d at 627–28 ("A plaintiff's allegations of negligence or innocent

-45-

mistake by a police officer will <u>not</u> provide a basis for a constitutional violation." (internal quotation marks omitted)). Courts have required substantial evidence when determining that an officer must "have entertained serious doubts about his 'positive' identification" (Docket Entry 22 at 18).[19]

For example, the United States Court of Appeals for the Third Circuit identified disputed questions of fact regarding a <u>Franks</u> violation when "substantial evidence of the witness' own unreliability [] could outweigh [a] positive identification." <u>Andrews v. Scuilli</u>, 853 F.3d 690, 705 (3d Cir. 2017). The officer in <u>Andrews</u> took a report regarding an incident during which a man (supposedly driving a red, four-door sedan) attempted to lure a teenage girl into his vehicle. <u>See id.</u> at 694-95. The victim provided a partial license plate for the vehicle and a physical description of the driver. <u>See id.</u> at 695 (identifying partial license plate "ACG" and describing perpetrator as "white male with dark hair, around 35 years old"). The following day, after the victim believed she saw the same vehicle, she reported its full license plate to the police. <u>See id.</u> (reporting license plate "JDG4817"). During a subsequent photo array including the image of the man who owned that vehicle, the victim identified him as the perpetrator. <u>See id.</u>

_____

[19] Plaintiffs' assertion that Jackson "should have" (<u>id.</u>) suggests Plaintiffs have sought to recover for conduct that qualifies, at most, as careless or negligent.

-46-

The officer thereafter located the vehicle bearing license plate JDG4817 and observed that "[it] was not a four-door sedan, but a red, three-door coupe." Id. In drafting the "affidavit of probable cause to arrest [the owner of that vehicle]," id., the officer (i) omitted the fact that the victim had provided a partial license plate not matching the target vehicle, see id. at 696, (ii) indicated that, one day after the attempted luring, "the victim [had] spotted th[e] same vehicle [involved in that incident]," id. (emphasis added), and (iii) modified the physical description given by the victim to more closely match the driver's license photograph of the owner of the target vehicle, the man identified via photo array, see id. at 696, 701. On appeal from a grant of summary judgment to the officer, the Third Circuit determined that the officer's averments about the vehicle "conveyed a higher degree of confidence in [the victim's] positive identification than was due." Id. at 702-03 (deeming discrepancies in physical appearance of driver immaterial to probable cause but correcting affidavit to include partial license plate and clarify that victim subsequently identified three-dour coupe, not four-door sedan, as involved in incident).

Here, Plaintiffs have failed to identify any comparable evidence from which a reasonable juror could find that Jackson deliberately or recklessly misled the Magistrate. (See Docket Entry 22 at 18-19.) Plaintiffs have suggested that Jackson should have doubted his identification based on "the poor quality of the

surveillance footage" (id. at 18), "[his] inability to see the suspect's face, eyes, and hair color" (id.), and "the discernable differences in body type of the suspect and Greg[ as depicted in the License Photograph]" (id.).[20] As support, Plaintiffs have cited an out-of-circuit case that discusses not Franks (or Miller) but the objective reasonableness of a mistaken identification, for purposes of analyzing the second prong of qualified immunity (see id. (citing Ingram v. City of Columbus, 185 F.3d 579, 596 (6th Cir. 1999))), a matter which the Court does not address here.[21]   At bottom, Plaintiffs have criticized Jackson's presentation to the Magistrate without acknowledging that Jackson's identification of Greg stemmed from unchallenged evidence that Jackson possessed about Greg's ownership of the Vehicle, and its use by the perpetrator to flee from the Sheetz.   Because the record lacks evidence of any deliberate or reckless misstatements or omissions by Jackson, no reasonable juror could conclude that he committed a Franks violation in obtaining the Warrant.[22]

_____

[20] The record undermines Plaintiffs' reliance on that final consideration, as the License Photograph depicts nothing more than Greg's face and neck.  (See Docket Entry 19-6.)

[21] In reversing a grant of summary judgment to the defendant officers, the Ingram court concluded that a jury needed to decide "whether reasonable police officers would have mistaken a man who was or had been napping for one who had just finished outrunning them at top speed."  Ingram, 185 F.3d at 596; see also id. (crediting "deposition testimony suggesting that [the arrestee] and [the suspect] d[id] not even resemble each other").

[22] Given that resolution, the Court need not address the materiality of any asserted misstatements or omissions.  See Unus,

-48-

## II. State-Law Claims

## A. Relevant State Law

### 1. Malicious Prosecution

Under North Carolina law, "[t]o establish malicious prosecution, a plaintiff must show that the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff." Turner v. Thomas, 369 N.C. 419, 425, 794 S.E.2d 439, 444 (2016). For such purposes, "[p]robable cause . . . has been properly defined as the existence of such facts and circumstances, known . . . at the time, as would induce a reasonable man to commence a prosecution." Cook v. Lanier, 267 N.C. 166, 170, 147 S.E.2d 910, 914 (1966) (internal quotation marks omitted) (quoting Morgan v. Stewart, 144 N.C. 424, 430, 57 S.E. 149, 151 (1907)). "In determining whether probable cause exists, the North Carolina Supreme Court employs the same totality of the circumstances test utilized in a Fourth Amendment probable[-]cause analysis." Quarles v. Weeks, 815 F. App'x 735, 738 (4th Cir. 2020) (citing State v. Allman, 369 N.C. 292, 293, 794 S.E.2d 301, 303 (2016)). Regarding the second element, "malice may be inferred from [a lack] of probable cause, [such] as where there was a reckless disregard of the rights of others in proceeding without probable cause." Cook, 267 N.C. at 170, 147 S.E.2d at 914.

---

565 F.3d at 124.

### 2. Negligent Infliction of Emotional Distress

The North Carolina Supreme Court has held that,

> [t]o state a claim for negligent infliction of emotional distress under North Carolina law, the plaintiff need only allege that: "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress."

Sorrells v. M.Y.B. Hosp. Ventures, 334 N.C. 669, 672, 435 S.E.2d 320, 321–22 (1993) (quoting Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990)). In deciding whether particular consequences qualify as foreseeable, courts must consider "the plaintiff's proximity to the negligent act, the relationship between the plaintiff and the other person for whose welfare the plaintiff is concerned, and whether the plaintiff personally observed the negligent act." Johnson, 327 N.C. at 305, 395 S.E.2d at 98. North Carolina law defines "severe emotional distress" to include "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Id. at 304, 395 S.E.2d at 97.

### 3. State Constitution

"[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under [the North Carolina] Constitution." Corum v. University of N.C., 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992).

-50-

A plaintiff may plead such a claim "in the alternative, [by] bringing his colorable claims directly under [the North Carolina] Constitution based on the same facts that formed the basis for his common[-]law . . . claim." Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009). "[S]tate officials, acting in their official capacities, that are obligated to conduct themselves in accordance with the [North Carolina] Constitution," Corum, 330 N.C. at 788, 413 S.E.2d at 293, may qualify as proper defendants, but no such "claim for money damages [exists] against individuals, acting in their personal capacities," id.[23]

A state remedy falls short of Corum's adequacy standard if it "provide[s no] possibility of relief under the circumstances." Craig, 363 N.C. at 340, 678 S.E.2d at 355 (emphasis added). Because "sovereign immunity, or governmental immunity, shields a municipality and its officers or employees sued in their official capacity from suit for torts committed while the officers or employees are performing a governmental function," Jones v. Kearns, 120 N.C. App. 301, 309-10, 462 S.E.2d 245, 250 (1995), sovereign immunity may render a state remedy inadequate, thereby giving way to a potential claim under the North Carolina Constitution, see

---

[23] As discussed in more detail in the Analysis Section that follows above, under North Carolina law, an official-capacity claim against a government official represents "another way of pleading an action against the governmental entity." Mullis v. Sechrest, 347 N.C. 548, 554-55, 495 S.E.2d 721, 725 (1998).

Corum, 330 N.C. at 785-86, 413 S.E.2d at 291-92; see also Craig, 363 N.C. at 340, 678 S.E.2d at 355 (recognizing that common-law claim fails to "provide an adequate remedy at state law when governmental immunity stands as an absolute bar to such a claim").

"Sovereign immunity is absolute unless the municipality consents to be sued or waives its immunity through the purchase of liability insurance." Jones, 120 N.C. App. at 310, 462 S.E.2d at 250 (citing N.C. Gen. Stat. § 160A-485(a) (1994)). "[A] county agency may waive its governmental immunity from suits for damages caused by an employee's negligent conduct 'by purchasing liability insurance, but only to the extent of the insurance coverage.'" Knibbs v. Momphard, 30 F.4th 200, 229 (4th Cir. 2022) (quoting Estate of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 341, 694 S.E.2d 405, 408 (2010)). In other words, "a county does not waive governmental immunity '[i]f the liability policy, by its plain terms, does not provide coverage for the alleged acts.'" Id. at 229-30 (brackets in original) (quoting Ballard v. Shelley, 257 N.C. App. 561, 565, 811 S.E.2d 603, 606 (2018)). Accordingly, the extent to which sovereign immunity renders a state remedy inadequate depends on the scope of any applicable insurance policy.

4. Public Official Immunity

"In North Carolina, official immunity protects public officials performing discretionary acts under color of authority from suit in their individual capacity." Evans, 703 F.3d at 656-57

-52-

(citing <u>Moore v. Evans</u>, 124 N.C. App. 35, 41, 476 S.E.2d 415, 421 (1996)). "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." <u>Smith v. State</u>, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976). Conduct qualifies as "malic[ious] when [a public official] wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." <u>Grad v. Kaasa</u>, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." <u>Givens v. Sellars</u>, 273 N.C. 44, 50, 159 S.E.2d 530, 535 (1968) (internal quotation marks omitted).

"Police officers engaged in performing their duties are public officials for the purposes of public official immunity . . . ." <u>Lopp v. Anderson</u>, 251 N.C. App. 161, 168, 795 S.E.2d 770, 776 (2016). "[H]owever, public official immunity does not immunize a municipality from liability for torts committed by a municipal employee acting in his official capacity." <u>Lee v. Town of Seaboard</u>, 863 F.3d 323, 330 n.6 (4th Cir. 2017) (citing <u>Wilcox v. City of Asheville</u>, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012)). "Thus, where a county or municipality has waived its governmental immunity — such as [through the purchase of an

-53-

insurance policy] — 'and is being sued for . . . the conduct of [one of its officers] in his <u>official</u> capacity,' the individual police officer's public official immunity 'is of no consequence.'" <u>Knibbs</u>, 30 F.4th at 231 (quoting <u>Lee</u>, 863 F.3d at 330 n.6).[24]

Regarding whether invocation of public official immunity by an employee could subject a public entity to a potential claim under the North Carolina Constitution,

> <u>unlike sovereign or governmental immunity</u>, public official immunity does not absolutely, entirely, or automatically preclude a plaintiff from presenting a claim on the merits. It is instead more akin to a usual affirmative defense that can be overcome through evidence of malicious conduct. Accordingly . . . it cannot be said that a defendant's assertion of the public official immunity defense entirely precludes suit and renders a plaintiff's common[-]law claims inadequate.

<u>Id.</u> at 232 (emphasis added) (internal brackets, citations and quotation marks omitted). Accordingly, "a remedy is still an adequate alternative to state constitutional claims where the plaintiff must show that the defendant acted with malice, despite the fact that such a showing would require more evidence." <u>Wilcox</u>, 222 N.C. App. at 302, 730 S.E.2d at 238 (internal quotation marks omitted).

---

[24] In other words, claims against a governmental entity do not depend on whether an official establishes his or her entitlement to public official immunity. <u>See</u> <u>Lowder v. Payne</u>, No. COA12-512, 226 N.C. App. 201, 739 S.E.2d 627 (table), 2013 WL 1121330, at *5 (N.C. Ct. App. Mar. 19, 2013) ("When the trial court applied the public official immunity doctrine to [the defendant officer], it absolved him of <u>individual</u> liability <u>only</u>. However, [the] plaintiff's actions against [the defendant officer] in his official capacity . . . remain intact . . . .")

-54-

**B. Analysis**

Although the parties have not addressed the issue in their briefing on the Motion (see Docket Entry 20 at 1–20; Docket Entry 22 at 1–25; Docket Entry 23 at 1–12), the basis for this Court's subject-matter jurisdiction over the State-Law Claims merits some discussion.

Pursuant to 28 U.S.C. § 1367(a),

in any civil action of which [federal] courts have original jurisdiction, [federal] courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). "[W]hether the federal-law claims and State-law claims are part of the same case is determined by whether they derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them all in one judicial proceeding." Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 615 (4th Cir. 2001) (internal brackets and quotation marks omitted). "Supplemental jurisdiction thus allows parties to append state law claims over which federal courts would otherwise lack jurisdiction, so long as they form part of the same case or controversy as the federal claims." Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995). Here, despite Defendants' silence on the subject in the notice of removal (see Docket Entry 1), the case-or-

Case 1:20-cv-01152-LPA   Document 24   Filed 08/24/22   Page 55 of 62

controversy requirement appears satisfied, such that the Court possesses supplemental jurisdiction over the State-Law Claims.[25]

However, "to say that the terms of § 1367(a) authorize [federal] courts to exercise supplemental jurisdiction over state[-]law claims . . . does not mean that the jurisdiction _must_ be exercised in all cases." City of Chicago v. International Coll. of Surgeons, 522 U.S. 156, 172 (1997). In that regard, a "[federal] court[] may decline to exercise supplemental jurisdiction over a claim" that "raises a novel or complex issue of State law," 28 U.S.C. § 1367(c)(1), or after "dismiss[al of] all claims over which it ha[d] original jurisdiction," 28 U.S.C. § 1367(c)(3); see also Shanaghan, 58 F.3d at 110 ("[C]ourts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.").

"In deciding whether to retain jurisdiction, courts have considered various factors, including: the convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Roseboro v. Winston-Salem/Forsyth Cnty. Sch. Bd. of Educ., No. 1:14CV455, 2014 WL 5304981, at *7 (M.D.N.C. Oct. 15, 2014) (unpublished) (citing Shanaghan, 58 F.3d at 110), recommendation adopted, slip

_____

[25] The record reflects no independent basis for subject-matter jurisdiction over the State-Law Claims, such as diversity of citizenship between Plaintiffs and Defendants, see 28 U.S.C. § 1332(a). (See Docket Entry 2 at 1 (suggesting that all parties qualify as citizens of North Carolina).)

op. (M.D.N.C. Dec. 9, 2014). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988). "With all its federal questions gone, there may be the authority to keep [a case] in federal court under 28 U.S.C. §§ 1367(a) and 1441(c) (2000), but there is no good reason to do so." <u>Waybright v. Frederick Cnty.</u>, 528 F.3d 199, 209 (4th Cir. 2008).

Here, the disposition of the Section 1983 Claim counsels in favor of declining supplemental jurisdiction. Additionally, the briefing on the Motion raises multiple state-law issues best suited for decision by a state court.

First, regarding the identity of Defendants for purposes of the State-Law Claims, the Complaint seeks relief from (1) Jackson in his individual capacity, (2) Jackson in his official capacity, and (3) the City. (<u>See</u> Docket Entry 2 at 14, 17, 20.) According to the Complaint, the City bears derivative liability for Jackson's conduct "under the doctrine of respondeat superior" (<u>id.</u> at 16, 19 (italics omitted)). The Complaint nowhere identifies a theory of liability for Jackson in his official capacity (<u>see</u> <u>id.</u> at 1–23), but Plaintiffs appear to view Jackson in his official capacity as distinct from the City (<u>see</u> Docket Entry 22 at 22 n.7 (suggesting that Jackson bears liability for NIED Claim in his official

-57-

capacity because "[he] has not raised sovereign immunity as a defense")).[26]

As a general matter, "[a]n official-capacity state-law claim against an individual officer . . . is construed as a claim against the municipality and is subject to the same jurisdictional rules as the suit against the governmental entity." White v. City of Greensboro, 532 F. Supp. 3d 277, 328 (M.D.N.C. 2021) (citing Meyer v. Walls, 347 N.C. 97, 111, 489 S.E.2d 880, 888 (1997), and Mullis v. Sechrest, 347 N.C. 548, 554-55, 495 S.E.2d 721, 725 (1998)) (viewing official-capacity malicious-prosecution claim against individual, under North Carolina law, as claim against municipality); see also Mullis, 347 N.C. at 554-55, 495 S.E.2d at 725 (citing Moore v. City of Creedmoor, 345 N.C. 356, 367, 481 S.E.2d 14, 21 (1997)) ("[O]fficial-capacity suits are merely another way of pleading an action against the governmental entity."). Consistent with that view, at least one panel of the North Carolina Court of Appeals has affirmed the dismissal of official-capacity claims against individual defendants, when the plaintiff also named as a defendant the governmental entity that employed those individuals. See, e.g., Wright v. Town of Zebulon, 202 N.C. App. 540, 543-44, 688 S.E.2d 786, 789 (2010) (citing

---

[26] Defendants, however, did raise sovereign immunity as a defense in their Answer. (See Docket Entry 5, ¶ 16 ("Plaintiffs are barred from recovery herein on their [S]tate[-L]aw [C]laims by the doctrine of sovereign or governmental immunity to the extent the City's liability, if any, falls outside its insurance coverage monetary limits.").)

-58-

_Moore_, 345 N.C. at 367, 481 S.E.2d at 21) (deeming dismissal appropriate on theory that suit against entity renders such official-capacity claims redundant); but see McCoy v. Coker, 174 N.C. App. 311, 317–18, 620 S.E.2d 691, 695–96 (2005) (affirming denial of motion to dismiss, thereby rejecting theory that _Moore_ precludes "a plaintiff [from] bring[ing] suit against both the governmental entity and its officer").

In response to a motion to dismiss official-capacity state-law claims as duplicative, this Court (per Chief United States District Judge Thomas D. Schroeder) has deemed dismissal warranted, notwithstanding the permissive approach endorsed in _Coker_. See Doe v. Durham Pub. Sch. Bd. of Educ., No. 1:17CV773, 2019 WL 331143, at *20 & n.12 (M.D.N.C. Jan. 25, 2019) (unpublished). However, the Court (again, per Chief Judge Schroeder) also has noted that, "because an official[-]capacity claim is a claim against the municipality, its dismissal should be sought by the municipality," Howard v. City of Durham, No. 1:17CV477, 2018 WL 1621823, at *9 (M.D.N.C. Mar. 31, 2018) (unpublished). Here, although Defendants appear to have sought summary judgment on all claims (see Docket Entry 19 at 1; see also Docket Entry 20 at 1–2, 19–21), they have failed to analyze whether the official-capacity State-Law Claims against Jackson merely duplicate those claims against the City, thereby warranting dismissal. The issuance of somewhat conflicting decisions by the North Carolina Court of Appeals about the propriety of pleading claims against official-capacity defendants

-59-

alongside their governmental employers results in a lack of clarity which weighs in favor of declination of supplemental jurisdiction.

Second, the interplay between sovereign immunity and the viability of the State Constitutional Claim raises another complex issue of state law. As explained above, the invocation of sovereign immunity may give rise to a claim under the North Carolina Constitution, but the purchase of liability insurance operates as a limited waiver of sovereign immunity. Because Defendants have acknowledged a partial waiver of sovereign immunity in that manner (see Docket Entry 20 at 15), the scope of the insurance policy at issue here likely will determine whether the State Constitutional Claim may proceed. Although Defendants have revealed some information about the applicable coverage (see id. (disclaiming reliance on sovereign immunity as grounds for the Motion because the City's insurance "provide[s] coverage for claims like false arrest and malicious prosecution")), no insurance policy appears in the record, such that the Court cannot determine, for example, whether the policy would cover the NIED Claim. Without that information, the Court cannot decide whether Plaintiffs' remedy at law remains adequate (for purposes of the State Constitutional Claim). See, e.g., Al-Nasra v. Cleveland Cnty., No. COA09-316, 202 N.C. App. 584, 691 S.E.2d 132 (table), 2010 WL 520909, at *5–7 (N.C. Ct. App. Feb. 16, 2010) (analyzing insurance policy language before concluding that constitutional claim properly survived summary judgment). Plaintiffs have provided no

analysis on that subject, given their apparent concession on the State Constitutional Claim. (See Docket Entry 22 at 1-25; see also id. at 25 (requesting that jury decide liability for Section 1983 Claim, Malicious-Prosecution Claim, and NIED Claim, without mention of State Constitutional Claim).) The foregoing uncertainties provide additional justification for this Court to decline supplemental jurisdiction.

At bottom, because the Court has resolved the Section 1983 Claim (the sole basis for original subject-matter jurisdiction) and has identified challenging, unresolved questions bearing on the State-Law Claims, the Court discerns "no good reason," Waybright, 528 F.3d at 209, to exercise supplemental jurisdiction over the remaining claims in this action.

## CONCLUSION

Probable cause existed to support Greg's seizure, and Jackson neither intentionally nor recklessly misstated or omitted material information in obtaining the Warrant. Given the absence of a fourth-amendment violation, the Court need not consider the second prong of the qualified-immunity analysis. In light of the disposition of the lone federal claim and the complexity of the (as yet fully developed) issues raised by the State-Law Claims, the Court declines to exercise supplemental jurisdiction.

**IT IS THEREFORE ORDERED** that the Motion (Docket Entry 19) is **GRANTED IN PART**, such that the Court will enter judgment in Defendants' favor on the Section 1983 Claim, but **DENIED IN PART**,

-61-

such that the Court will remand the State-Law Claims to Stokes County Superior Court.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 24, 2022

Case 1:20-cv-01152-LPA   Document 24   Filed 08/24/22   Page 62 of 62